1     IN THE UNITED STATES DISTRICT COURT
    FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

3 UNITED STATES OF AMERICA   :
            :
4   v.        :  Criminal No. 04-46 Erie
            :
5 EDWARD BURKHART     :

6

7

8

9    Detention Hearing in the above-captioned

10  matter held on Monday, February 27, 2006,

11  commencing at 2:00 p.m., before the Honorable

12  Susan Paradise Baxter, at the United States Courthouse,

13  Courtroom B, 17 South Park Row, Erie, Pennsylvania

14  16501.

15

16

17

18

19 For the United States of America:

20   Christian A. Trabold, Esquire
    Office of the United States Attorney
21

22 For the Defendant:
    Stephen Sebald, Esquire
23

24

25     Reported by Janis L. Ferguson, RPR

1                          I N D E X

2

3    TESTIMONY OF MATTHEW L. REA

4          Direct examination by Mr. Trabold  . . . . . . . . .  3

5          Cross-examination by Mr. Sebald  . . . . . . . . . . 15

6          Redirect examination by Mr. Trabold  . . . . . . . . 18

7

8

9    EXHIBITS:

10         Government Exhibit 1 - Page 19

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  The case before the Court is United

2     States of America versus Edward O. Burkhart.  It's docketed

3     at No. 04-46 Erie.  Representing the Government is Christian

4     Trabold.  Representing the Defendant is Stephen Sebald.

5          THE COURT:  Good afternoon.  As I explained to

6     you, Mr. Burkhart, the last time I saw you, we're going to

7     be deciding today whether or not you should remain in jail

8     before your revocation hearing in front of the District

9     Judge.  Do you understand?

10          MR. BURKHART:  I understand, yes.

11          THE COURT:  Mr. Trabold?

12          MR. TRABOLD:  Thank you, Your Honor.  The

13     Government calls Probation Officer Matt Rea.

14

15       M A T T H E W  L.  R E A, first having

16       been duly sworn, testified as follows:

17

18          THE CLERK:  State your full name and spell your

19     last name for the record.

20          THE WITNESS:  Matthew L. Rea, R-E-A.

21

22                    DIRECT EXAMINATION

23     BY MR. TRABOLD:

24

25       Q.  Sir, how long have you worked as a U.S. Probation

1  Officer?

2      A.    Three years.

3      Q.    And during the course of those three years, have

4  you been assigned to supervise Edward Burkhart?

5      A.    Yes, I have.

6      Q.    And this is Mr. Burkhart here (indicating)?

7      A.    Yes, it is.

8      Q.    Okay.  And was Mr. Burkhart convicted of a federal

9  offense in the Western District of Pennsylvania?

10     A.    He was convicted in the District of Utah

11 originally.

12     Q.    And his District of Utah conviction was for

13 traveling across state -- interstate lines with the intent

14 to engage in sexual contact with a minor.

15     A.    This is with a juvenile, but that's correct.

16     Q.    And for that conviction in the District of Utah,

17 he got 30 months' incarceration.

18     A.    That's correct.

19     Q.    And during the course of his incarceration and/or

20 adjudication on that, his supervision time was transferred

21 from the District of Utah back to the Western District of

22 Pennsylvania.

23     A.    That's correct.

24     Q.    And what was the reason for the transfer from Utah

25 back to Pennsylvania?

1          A.    This is his hometown.

2          Q.    So he was living -- Mr. Burkhart was living in the

3    Western District of Pennsylvania when he committed his

4    federal offense.

5          A.    That's correct.

6          Q.    You then began to supervise him on federal

7    supervised release when?

8          A.    The first time?

9          Q.    Correct.

10         A.    I began supervising him on August 3rd of '04.

11   Well, let me check that date.

12         Q.    Sure.  Take your time.

13         A.    Actually, the very first time I began supervising

14   him, on April 27th of '03.

15         Q.    And Mr. Burkhart was then out on supervised

16   release here in the Erie area for a period of time.

17         A.    That's correct.

18         Q.    And then you moved to revoke his supervised

19   release back in October of '04.

20         A.    That's correct.

21         Q.    And subsequent to your filing of a petition for

22   supervised release revocation, was Mr. Burkhart's supervised

23   release actually revoked?

24         A.    Yes, it was.

25         Q.    And that would have occurred, again, in mid

1    October of 2004.

2         A.    October 15th, 2004.

3         Q.    And what was the -- what was the basis or the

4    reason for the revocation back in October of 2004?

5         A.    He was having contact with minors without the

6    permission of the Court or me.

7         Q.    And subsequent to his supervised release

8    revocation, Mr. Burkhart received a sentence of an

9    additional year of incarceration and two more years of

10   supervised release.

11        A.    That's correct.

12        Q.    And he was then released back on September 27th of

13   '05, and then you then began to supervise him again.

14        A.    That's correct.

15        Q.    Now, subsequent to his release in late September

16   of 2005, very early on in your renewed supervision of him,

17   did you have a conversation with him that caused you some

18   concern?

19        A.    That would be on February -- well, I had a couple

20   conversations --

21        Q.    Back in October of '05, did you have a brief

22   conversation, or did Mr. Burkhart share some information

23   with you that caused some concern?

24        A.    Yes.  On October 11, 2005, and also again on

25   February 3rd, 2006 --

1     Q.    Well, let's first take October 11th of 2005.

2     A.    Okay.

3     Q.    What, if anything, did Mr. Burkhart tell you that

4  caused you some concern?

5     A.    He told me he had two temptations for neighborhood

6  children.

7     Q.    And did you get into that with him, or did you

8  have him explain that to you or point out who the

9  neighborhood children actually were?

10    A.    On that particular date, I did not get into

11 specifics with him.

12    Q.    Now, on February 1st of 2006, do you and your

13 fellow Probation Officer, Dave Condi, travel to

14 Mr. Burkhart's house?

15    A.    Yes, we do.

16    Q.    Was there an event that precipitated you going

17 there or some reason that caused you to go to his house on

18 February 1st?

19    A.    On January 31st, 2006, Mr. Burkhart again said

20 that he had two different temptations for neighborhood

21 children.

22    Q.    And, again, were any specifics provided in that

23 regard?

24    A.    Well, he said they were in very close proximity to

25 his house.  And I took that to believe just on his street

1    right there.

2        Q.   And separate -- we'll talk in a second about what

3    happens on February 1st.  But did you take some further

4    action in regard to Mr. Burkhart's revelation to you about

5    his temptations with regard to those children?

6        A.   On February 3rd, 2006, I notified the adult

7    parents of the two children that lived two doors down from

8    his residence that he was a registered sex offender.

9        Q.   And how old were the kids that lived at that house

10   where you went and notified their parents?

11       A.   One was approximately 11 or 12.  The other one was

12   five or six.

13       Q.   Now, you and Mr. Condi then go to Mr. Burkhart's

14   house on February 1st of '06.

15       A.   That's correct.

16       Q.   What was your purpose in going there?

17       A.   It was a standard visit that we do with any --

18   anybody that's under supervision.  But because of his

19   statements made on the 31st of January, we took it out to be

20   there within a short time period, which would have been the

21   1st.

22       Q.   Okay.  And upon going there, did you -- was

23   Mr. Burkhart home?

24       A.   Yes, he was.

25       Q.   And did he allow you to come in the house?

1     A.   Yes, he did.

2     Q.   And did you then have a conversation with him?

3     A.   Yes, we did.

4     Q.   As part of your stay at his residence, did you go

5  into his bedroom?

6     A.   I and U.S. Probation Officer David Condi did.

7     Q.   And did you see some things in his bedroom which

8  gave you a cause for concern?

9     A.   The first thing that Probation Officer Condi

10  noticed was a pair of tennis shoes that appeared to be

11  smaller in size.  From there, Mr. Condi --

12     Q.   Let me -- go ahead.  I didn't mean to interrupt.

13     A.   Mr. Condi --

14          MR. SEBALD:  Judge, I'm going to object to any

15  testimony as to what Mr. Condi did or did not see from

16  Mr. Rea.

17          THE COURT:  I understand that.  In this type of

18  proceeding, though, that is permissible, so overruled.

19  BY MR. TRABOLD:

20     Q.   Go ahead.

21     A.   We then -- Mr. Burkhart, myself, and David Condi

22  then entered his bedroom.  From there, we saw DVD's on the

23  floor; one in particular that appeared to be adolescent

24  males.  And there was also another DVD there on the floor

25  beside that one.  And there was also a black/silver metal

1    block, which appeared to me to be an external hard drive.

2        Q.    And subsequent to finding that initial DVD, did

3    Probation Officer Condi then discover in the bedroom under

4    Mr. Burkhart's bed a whole dozen or so additional DVD's?

5        A.    Right.    There was 11 more; young, very young men.

6    They were gay DVD videos or DVD's.    So there was 13 total.

7        Q.    And to be fair, did those DVD's appear to be

8    commercially produced DVD's?

9        A.    They appeared to be, yes.

10        Q.    And would it be fair to say that those are

11    centered or themed around the idea of young men or

12    adolescent boys?

13        A.    Yes.    They all seemed to be -- the first one we

14    originally saw appeared to me to be 14-, 15-year-old boys,

15    but they all were younger men.

16        Q.    Did you and Probation Officer Condi begin to

17    discuss these items of concern with Mr. Burkhart?

18        A.    Yes, we did.

19        Q.    And did the topic of the external hard drive come

20    up?

21        A.    Yes, it did.

22        Q.    And was Mr. Burkhart asked specifically during the

23    course of that conversation on the 1st of February whether

24    or not there may be child pornography on the external hard

25    drive?

1     A.   Yes.  I asked him -- I asked him that question,

2  and he said there may or may not be, but he wasn't sure.  He

3  also stated he was trying to wipe it clean, but didn't have

4  the modern computer at that time to do it.  That's what he

5  told me then.

6     Q.   And you then, as part of your work that day as

7  Probation Officers, took with you the -- some items that

8  were of concern to you and secured them in the Probation

9  Office safe, correct?

10     A.   That's correct.

11     Q.   And those items would be generally the external

12  hard drive, two floppy diskettes that were there, and the

13  DVD's that we have talked about.

14     A.   That's correct.

15     Q.   Now, subsequent to that interaction at

16  Mr. Burkhart's house, on February 2nd of this year, did

17  Mr. Burkhart come for an office visit to your office here in

18  the courthouse?

19     A.   Yes, he did.

20     Q.   And did Mr. Burkhart reveal things to you during

21  the course of that conversation that were of concern to you?

22     A.   Yes, he did.

23     Q.   What did he tell you?

24     A.   He stated that he was on line, on the computer

25  viewing and searching for porn and kiddie porn.

1      Q.   Now, did that conversation occur on February 2nd

2   or later on after February 2nd?

3      A.   That conversation occurred on -- well, I'm sorry.

4   That conversation, when he -- when he admitted to surfing

5   Internet porn, it was on the 16th of February.

6      Q.   But on the 2nd -- we'll get to what happened on

7   the 16th momentarily.  But on the 2nd, does Mr. Burkhart

8   indicate to you what -- why or what happens to him when he

9   watches pornography?

10      A.   He admitted that when he watches gay porn, it's a

11   trigger for him to have sexual fantasies of having sex with

12   minor-aged males.

13      Q.   And did he indicate to you anything else of

14   concern to you with regard to his ability to control his

15   behavior during your discussion on February 2nd?

16      A.   He mentioned that the night before he was suicidal

17   and that he was accompanied -- on the February 2nd office

18   appointment, he was accompanied by his brother to the

19   office.

20      Q.   Did he say why?

21      A.   Just for added support and that he may or may not

22   trust himself to drive alone.

23      Q.   What did you take that to mean?

24      A.   That he could act out irrationally; possibly

25   victimize some unsuspecting minor.

1      Q.   And he then indicated to you during the course of
2  also the February 2nd conversation that he wasn't worried
3  about what was on the diskettes, but that the hard drive may
4  be bad, and he was somewhat worried about what may be on the
5  hard drive.
6      A.   That's what he said, yes.
7      Q.   Based on your interactions, then, with
8  Mr. Burkhart, a federal search warrant was obtained
9  authorizing the search of the data held on the external hard
10  drive.
11      A.   That's correct.
12      Q.   Now, on February 16th, you had a further
13  conversation or further interaction with Mr. Burkhart.
14      A.   That's correct.
15      Q.   And what, if anything, did Mr. Burkhart say on
16  February 16th with regard to any computer activity that he
17  might be engaged in?
18      A.   He said he had been on line, on the computer, on
19  the Internet, and that he had been surfing the web for --
20  for porn and kiddie porn.
21      Q.   So he indicated that he was actively looking for
22  child pornography and viewing it on his computer.
23      A.   Well, he didn't necessarily say he was only
24  looking for child pornography, but that he was looking for
25  pornography, and that kiddie porn became part of his

1  searches.

2      Q.    And did he indicate that during the course of

3  searching that he actually found any child pornography?

4      A.    He said he did.

5      Q.    Now, just with regard to a few background factors

6  as they relate to Mr. Burkhart, you had an opportunity to,

7  during the course of your supervision, review Mr. Burkhart's

8  presentence report.

9      A.    That's correct.

10     Q.    And does the presentence report drafted by the

11 District of Utah, does it contain a section describing his

12 evaluation by a psychologist?

13     A.    Yes, it does.

14     Q.    And does the psychologist, during the course of

15 that evaluation, provide a diagnosis of Mr. Burkhart?

16     A.    I believe it's an Axis I pedophile diagnosis.

17     Q.    And that would have been an evaluation that

18 occurred around the time he had been convicted in the

19 District of Utah.

20     A.    That's correct.

21     Q.    Which would have been back in '01.

22     A.    That's correct.

23     Q.    Now, as part of your supervision duties of

24 Mr. Burkhart, would it be fair to say that the FBI's Salt

25 Lake City office provided to you a videotape?

1          A.    Yes, they did.

2          Q.    And is there a portion of the videotape that

3    depicts Mr. Burkhart?

4          A.    Yes, there is.

5          Q.    And in the portion depicting Mr. Burkhart, is it

6    fair to say that Mr. Burkhart is masturbating?

7          A.    Yes.

8          Q.    And during the course of him masturbating, is

9    Mr. Burkhart discussing his child molestation activities?

10         A.    Yeah.

11         Q.    And does Mr. Burkhart specifically name children

12   or point to pictures in the videos?

13         A.    Yes, he does.

14              MR. TRABOLD:  Nothing further, Your Honor.

15              THE COURT:  Cross-examination, sir.

16

17                        CROSS-EXAMINATION

18   BY MR. SEBALD:

19

20         Q.    Now, does my client keep all of his appointments

21   with you?

22         A.    Yes, he does.

23         Q.    And does he attend all Court-ordered, under the

24   term of his supervised release, counseling?

25         A.    Yes, he does.

1      Q.   And who does he attend counseling with?

2      A.   Dr. Kovacs, Dr. Paul Kovacs.

3      Q.   Would it be fair to characterize it, when

4  Mr. Burkhart -- when you allege that he was talking to you,

5  that he was actually indicating to you that he wanted your

6  help in drafting a safety plan for him?

7      A.   I'm unfamiliar with what you mean by a "safety

8  plan".

9      Q.   Well, wasn't he proactively coming into your

10  office saying that he was concerned about some feelings that

11  he was having?

12      A.   That's correct.

13      Q.   And he was telling you, as his Probation

14  Officer -- he divulged this on his own; is that correct?

15      A.   On his own, that's right.

16      Q.   Now, as part of your supervision, you're required

17  to know where he resides; is that correct?

18      A.   That's correct.

19      Q.   And where does he reside?

20      A.   1726 West 50th Street.

21      Q.   Who does he reside there with?

22      A.   His brother John.

23      Q.   Do you know what his brother John's occupation is?

24      A.   I believe he's an instructor.

25      Q.   And you also indicated that the day that you're

1    alleging that my client came in and made these statements,

2    that he brought his brother with him.  Is that correct?

3         A.   That would have been on the February 2nd visit,

4    yes.

5         Q.   And he brought his brother in because he was

6    actually concerned.

7         A.   I believe so.  You're saying John was concerned

8    for Ed?

9         Q.   Yes.

10        A.   I didn't talk to John specifically, but I believe

11   that's what he was there for.

12        Q.   I want to talk to you about this February 16th

13   meeting.  At that time were you aware of the fact that I had

14   been retained by Mr. Burkhart?

15        A.   Not till the end of the meeting on the 16th.

16        Q.   So at no point before that did anybody reveal to

17   you that I had, in fact, been retained.

18        A.   That's correct.

19             MR. SEBALD:  Your Honor, may I have a moment?

20             THE COURT:  You may.

21             (Discussion held off the record.)

22        Q.   Now, these videos that you discussed taking, you

23   said that you locked them in a safe at Probation?

24        A.   The hard drive and the diskettes were locked in

25   the safe.

```
 1        Q.   And are those tagged with some sort of tag?

 2        A.   They never left my sight.  They were immediately

 3   locked up in a safe.

 4        Q.   And the DVD, as far as you know, that was -- did

 5   that have a U.S. seal warning for pornography on it; that

 6   it's legal?

 7        A.   After we investigated that further, we did see

 8   that, yes.

 9             MR. SEBALD:  That's all I have, Your Honor.

10             THE COURT:  Thank you.

11             MR. TRABOLD:  Just a few follow-ups, Your Honor.

12

13                     REDIRECT EXAMINATION

14   BY MR. TRABOLD:

15

16        Q.   Would it be accurate to say that Mr. Burkhart's

17   approved residence is in close proximity to St. George's

18   School?

19        A.   That's correct.

20        Q.   Within --

21        A.   About two and a half blocks.

22        Q.   And would you characterize Mr. Burkhart as being a

23   person who has over time indicated to you an increasing

24   concern about his own ability to control himself?

25        A.   Yes.
```

1          MR. TRABOLD:  Nothing further, Your Honor.

2          THE COURT:  Thank you.  Anything else?

3          MR. SEBALD:  Nothing, Your Honor.

4          THE COURT:  You may step down.  Thank you very

5    much, Officer Rea.

6              Mr. Trabold, next witness.

7          MR. TRABOLD:  Nothing further, Your Honor.

8          THE COURT:  Any proffer other than that?

9          MR. TRABOLD:  I don't know if you want me to -- I

10   can proffer his -- Mr. Burkhart's presentence report.  I

11   guess it's Government's 1.

12         THE COURT:  I don't think I have that.

13         MR. TRABOLD:  I think you probably have that in

14   your file, but --

15         (Discussion held off the record.)

16         MR. TRABOLD:  This can be Government's 1, Your

17   Honor.

18             (Government Exhibit No. 1

19              marked for identification.)

20         MR. TRABOLD:  That would be all additional that we

21   would have relative to the -- I don't know if you need -- I

22   can proffer the search warrant that was resulting in -- that

23   resulted in the search of the --

24         THE COURT:  That's just cumulative.  We have the

25   testimony.

1          MR. TRABOLD:  Thank you.

2          THE COURT:  Attorney Sebald?

3          MR. SEBALD:  Just argument, Your Honor.

4          THE COURT:  Do you have any proffers or witnesses

5    at this time?

6          MR. SEBALD:  No, Your Honor.

7          THE COURT:  That's fine.  We'll start with you,

8    then, on the argument.

9          MR. SEBALD:  Your Honor, I'd argue that you should

10   consider releasing Mr. Burkhart.  I realize what the

11   standard is here; that it's clear and convincing.  The

12   burden is upon me that that is appropriate for you to

13   consider doing that.

14            I would ask you to consider the following

15   factors:  According to Mr. Rea's testimony, you have heard

16   that Mr. Burkhart allegedly came in and indicated to him

17   that he was concerned about his safety.  I would -- I would

18   question -- I mean, what Mr. Burkhart indicated to Mr. Rea

19   indicates to me that he's actually following his probation

20   plan; attempting -- not attempting, but actually being

21   successful in not harming anyone in the community.

22            Furthermore, Your Honor, currently at the

23   prison, he is not receiving the proper medication, he is not

24   receiving the group treatment with Dr. Paul Kovacs.  I would

25   ask that the Court consider -- and I would like the Court to

1    know that my client would be open to chemical castration,

2    house arrest.  In this way he would be able to attend his

3    treatment meetings with Dr. Kovacs.

4                    I would also ask the Court -- and the reason

5    that I asked Mr. Rea these questions -- to consider the fact

6    that my client isn't simply at home alone three blocks from

7    St. George's School.  It's more of a situation where his

8    brother is a teacher, his brother is an adult, and his

9    brother is very willing and able to help supervise his

10   conduct.

11           THE COURT:  His brother is gone five days a week

12   teaching during the day; is that correct?

13           MR. SEBALD:  Yes.

14           THE COURT:  And the Defendant doesn't have another

15   employment?

16           MR. SEBALD:  No, he does not have employment, Your

17   Honor.

18           THE COURT:  Okay.  Thank you.

19           MR. TRABOLD:  Your Honor, the Bail Reform Act

20   directs you to consider a number of characteristics and

21   circumstances that are present in this case.  Unfortunately

22   in this case for Mr. Burkhart, none of the factors that you

23   are directed to consider mitigate in his favor.

24                    This is a Defendant with a prior conviction

25   involving the attempted, at least, sexual exploitation of a

1    minor.  This is a Defendant who over time has increasingly

2    been indicating his inability to control his sexual desires

3    towards children.  This is a Defendant who not more than

4    approximately a year and a half ago was -- had his

5    supervised release revoked the first time because he

6    couldn't do what he was required to do.  And the first time

7    for his supervised release revocation was because he was

8    having unsupervised contact with minors.  This time the

9    situation is hardly better, because he's accessing child

10   pornography on the Internet, which is doubly concerning,

11   because not only is it child pornography, but this Defendant

12   has indicated that viewing that type of material triggers

13   his sexual fantasies towards minor males.

14           Plainly, Your Honor, there is nothing in the

15   record before you as it relates to the Bail Reform Act that

16   is in Mr. Burkhart's favor.  He does not work, he has shown

17   little or no ability to abide by his probationary

18   requirements, as evidenced by his prior revocation.

19           There has been no evidence presented by Mr.

20   Burkhart with regard to a third-party custodian.  And even

21   if there was, what difference would it make, because

22   Mr. Burkhart obviously was committing crimes prior to coming

23   into court here today relative to his child pornography

24   endeavors.

25           So we would ask that you retain him pending

1  the revocation hearing and find that there has been probable

2  cause established for the revocation.  Thank you.

3  　　　　　THE COURT:  Thank you.  Anything you would like to

4  respond to that with, Attorney Sebald?

5  　　　　　MR. SEBALD:  No, Your Honor.

6  　　　　　THE COURT:  I am concerned about the medication at

7  the Erie County Prison.  Have you talked to anyone there

8  about that?

9  　　　　　MR. SEBALD:  Yes, Your Honor.  His brother has

10  actually made several contacts, attempting -- he has the

11  scripts for the medication to be filled, but I guess it's

12  some kind of administrative problem and who pays for these.

13  　　　　　　　His brother has indicated a willingness to

14  pay for the prescriptions to get them to Mr. Burkhart.

15  　　　　　THE COURT:  And is the prison unable to do that?

16  Do they want to fill the prescription themselves?  Do you

17  understand how that works?

18  　　　　　MR. SEBALD:  My understanding of it is, there's

19  some hold-up; that they actually have to have a script from

20  the prison doctor, which doesn't make any sense to me.

21  　　　　　THE COURT:  I see.  So he has to be seen by the

22  prison doctor.

23  　　　　　MR. SEBALD:  Yes.

24  　　　　　MR. TRABOLD:  Your Honor, in general terms, the

25  prison doesn't allow inmates to come in with their own

1    prescription.

2            THE COURT:  That's my recollection.  I was

3    wondering if a prescription -- I think that's right.  I was

4    trying to think of a way that he could -- but it doesn't

5    seem like it would work.  If they had a prescription that

6    they filled instead of coming in with the actual

7    medication -- but he has to see a physician.  Is there one

8    scheduled, do you know?

9            MR. SEBALD:  I do not know, Your Honor.

10           THE COURT:  You have to keep pushing that, since

11   he has to have that treatment.

12           Mr. Burkhart, I'm going to keep you detained

13   until your revocation hearing, which is scheduled for

14   March 10th.

15           Now, the order that I signed in these

16   situations actually is a 10-day order, so -- not a 10-day

17   order.  I'm sorry -- well, it's 10 days if you don't count

18   the weekends, and that is what is happening here.  So it

19   will be in effect until March 13th, so that will include the

20   revocation hearing.  For the reasons that I find that the

21   ability to view and to search for child pornography on the

22   Internet is of a concern to me, obviously, because the

23   tendencies, though in check till this point, I'm not

24   confident that that could be kept in check.

25           And your brother, though, of course, is

1    well-meaning, I don't think he can be there all the time.

2    We also can't take the ability for your brother, because of

3    his profession, to take the Internet out of the house.

4            That, along with the past history, the past

5    revocation order, and the violations pending against you

6    with regard to the pornography you had with you in your

7    room, is clear and convincing evidence to me that you could

8    be a danger to the community if you were released in the

9    next 10 days.  Do you understand?

10           MR. BURKHART:  I understand.

11           THE COURT:  You may appeal that order to the

12   District Judge in this time period before the hearing.

13           Is there anything else, Mr. Trabold?

14           MR. TRABOLD:  No, Your Honor.

15           MR. SEBALD:  No, Your Honor.

16           THE COURT:  I will have the Order filled out and

17   signed for you in a few minutes.  Thank you.  We are

18   adjourned.

19

20           (Hearing concluded at 2:39 p.m.)

21

22

23

24

25